1
2
3                          UNITED STATES DISTRICT COURT
4                                DISTRICT OF NEVADA
5                                       * * *
                                          )
6   MENALCO, FZE, et al.,                 )
                                          )
7                 Plaintiffs,             )
                                          )           2:07-CV-01178-PMP-PAL
8   v.                                    )
                                          )
9   ROBERT GORDON BUCHAN, et al.,         )              ORDER
                                          )
10                Defendants.             )
                                          )
11  _____

12          Presently before the Court is Defendant/Cross-Defendant Robert Buchan's

13  Motion for Summary Judgment (Doc. #272), filed on July 28, 2009.  Plaintiffs filed an

14  Opposition (Doc. #290) on August 13, 2009.

15          Also before the Court is Defendant/Cross-Defendant Mark Bone-Knell's Motion

16  for Summary Judgment (Doc. #273), filed on July 28, 2009.  Plaintiffs filed an Opposition

17  (Doc. #291) on August 13, 2009.  Mark Bone-Knell filed a Reply (Doc. #308) on

18  September 18, 2009.

19          Also before the Court is Plaintiffs' Motion for Summary Judgment (Doc. #275),

20  filed on July 28, 2009.  Defendant Mark Bone-Knell filed an Opposition (Doc. #309) on

21  September 18, 2009.  Plaintiffs filed a Reply (Doc. #313) to Mark Bone-Knell's Opposition

22  on October 1, 2009.  Defendant Robert Buchan filed an Opposition (Doc. #317) on October

23  14, 2009.  Plaintiffs filed a Reply (Doc. #326) on October 28, 2009.  Defendants Phoenix

24  Technology Holdings, Inc., and Schimatic Cash Transactions Network.com filed an

25  Opposition (Doc. #318) on October 19, 2009.  Plaintiffs filed a Reply (Doc. #328) on

26  November 2, 2009.

# I. BACKGROUND

Plaintiff The International Investor, K.S.C.C. ("TII") is a publicly traded Kuwaiti company which conducts business in the areas of non-banking financial services and investment banking.  (Pls.' Mot. for Summ. J. (Doc. #275) ("Pls.' MSJ"), Ex. B at 2.) Plaintiff Menalco, FZE ("Menalco") is a limited liability corporation organized under the laws of the United Arab Emirates, and is TII's wholly owned subsidiary.  (Id.)  As part of TII's non-banking financial services business, TII began developing a loyalty business model which it called "Selektpoints," a registered trademark owned by TII.  (Id.)

A loyalty program rewards customers for desired behavior.  (Def. Buchan's Opp'n to Pls.' Mot. Summ. J. (Doc. #317) ["Buchan Opp'n"], Ex. A ("Buchan Aff.") at 2.) It provides merchants with the opportunity to identify and manage relationships with their best customers, and customers benefit by earning rewards for their purchasing behavior as loyal customers.  (Buchan Opp'n, Ex. J.)  Selektpoints is a worldwide loyalty program using smart chip technology in credit and debit cards.  (Pls.' MSJ, Ex. A1.)  Selektpoints provides for issuer banks, called "landlord banks," to rent space on the debit or credit card through use of a loyalty application loaded onto the smart chip.  (Id.)  The consumer can use the card to make a payment and to collect loyalty points in a loyalty program at the same time using the same card.  (Id.)  The card also captures consumer purchase data which can be used by participating merchants and provides for third party management of merchants' loyalty programs.  (Id.)

In January 2005, Edward Holmes ("Holmes"), a TII executive, hired Defendant Robert Buchan ("Buchan") to work for TII's loyalty division.  (Buchan Aff. at 1; Pls.' MSJ, Ex. B at 3.)  Although Buchan ultimately reported to TII, Buchan entered into employment agreements with third party companies and was assigned to work as Chief Operating Officer of Retail Financial Services for TII's Loyalty Division.  (Buchan Aff. at 3, 5.) Buchan's understanding as to why he was employed by intermediary companies was

because United Arab Emirates law required a company wishing to maintain employees in the Emirates to establish an entity there, and TII had no such entity.  (Id. at 4.)

According to Buchan, from the time he was hired and throughout his employment relationship with TII, he was "advised verbally and in writing that a primary objective was to secure investment and/or joint venture opportunities to bring Plaintiffs' loyalty business to the global marketplace."  (Id. at 3.)  Buchan avers that when he started at TII, its proposed loyalty program was a "bare bones merchant-based Sharia compliant concept." (Id. at 4.)  Buchan advised TII the concept as it then existed was not workable,[1] and he began working with Holmes over the ensuing months to design the Selektpoints program. (Id.)

In March 2006, Buchan left the employ of the intermediary company to accept a job with another entity unrelated to TII.  (Id. at 5.)  According to Buchan, Holmes flew to Dubai to "implore" him to stay and offered Buchan a new contract.  (Id. at 6.)  Buchan entered into an employment contract with TII on June 1, 2006.  (Id.)

According to Buchan, throughout 2006, he and Holmes worked to bring Selektpoints to the global marketplace.  (Id.)  Buchan recommended to TII that it consider contacting Defendants Schimatic Cash Transactions Network.com ("SCTN") and Phoenix Technology Holdings Inc. ("Phoenix"), because these companies owned and licensed patented software technologies that could assist in bringing Selektpoints to market in certain territories.  (Id.)

Defendant SCTN is a Nevada corporation which owns several patents, including one for a "Method and System for Allocating and Redeeming Incentive Credits." (SCTN/Phoenix Opp'n to Pls.' Mot. for Sanctions (Doc. #194), Ex. 1; SCTN/Phoenix Ans.

---

[1]  The Court considers Buchan's statement that he told TII the concept was not workable not for the truth of the matter asserted, i.e., that the concept was in fact not workable, but for the fact that he so advised TII.

1   & Verified Countercls. & Crosscls. (Doc. #19) ["Countercl."] at 24.)  SCTN has been

2   developing loyalty software since 1994 and has spent approximately $70 million in

3   developing the software and technology.  (Countercl. at 26.)  The patented technology

4   consists of software and other technology for a method of implementing a loyalty program

5   on a smart chip embedded in a credit or debit card which will process the loyalty transaction

6   and associated data simultaneously with the purchase transaction.  (Id.)  SCTN has patented

7   this technology in the United States, Canada, Mexico, Australia, and Japan.  (Id. at 26-27.)

8   Defendant Phoenix is a Turks and Caicos Islands corporation which has the exclusive

9   worldwide rights to license SCTN's patented technology.  (Id. at 25.)

10          Phoenix had an agreement with Krako, Inc. pursuant to which Nik Korakianitis

11  ("Korakianitis") was to market the SCTN/Phoenix technology and receive sales

12  commissions on any licenses Phoenix signed based on his efforts.  (SCTN/Phoenix Opp'n

13  to Pls.' Mot. for Sanctions (Doc. #194), Ex. 1.)  Korakianitis had business cards with

14  SCTN's logo, name, and website, and which identified Korakianitis as "Executive Vice

15  President Business Development," with an email address at SCTN.  (Pls.' MSJ, Ex. A9 at

16  68-69.)  Korakianitis used the SCTN email address throughout the time he had a business

17  relationship with SCTN.  (Id. at 70.)  Korakianitis also had business cards for several other

18  entities for which he performed sales services, including Selektpoints.  (SCTN/Phoenix

19  Opp'n to Pls.' Mot. Summ. J. (Doc. #318) ["SCTN Opp'n"], Ex. 7 at 28.)  According to

20  Korakianitis, it is common for him to represent himself as an employee of the companies

21  with which he has contracted.  (Id. at 27.)  However, Korakianitis lacked signatory authority

22  to bind SCTN.  (Id. at 292.)  Korakianitis met with Buchan and Holmes for TII to evaluate

23  the SCTN/Phoenix software.  (Id. at 32.)

24          In September 2006, Phoenix and TII entered into a Licensing Agreement for

25  SCTN to provide a customized software program to implement the Selektpoints program.

26  (Buchan Aff. at 7; Pls.' MSJ, Ex. A10 at 128, Ex. A11.)  Pursuant to the Licensing

1   Agreement, Phoenix agreed to grant TII a non-exclusive license for the SCTN technology

2   in exchange for licensing fees.  (Pls.' MSJ, Ex. A11.)  Although the license was not

3   exclusive, it was Phoenix's and SCTN's "policy . . . not to license new Licensees where

4   their business is directly competitive without reviewing the impact on the business of a

5   previous licensee."  (Id. at 4.)  Pursuant to the Agreement, TII agreed to hold confidential

6   "all information relating to SCTN Applications, Products, Technologies, and other

7   Intellectual Property, including accompanying documentation."  (Id. at 7.)  Upon

8   termination of the Licensing Agreement, TII had to return all SCTN products and

9   documentation provided to TII or to an authorized affiliate or distributor of TII.  (Id. at 9.)

10  Appendix A to the Agreement describes the various products Phoenix was to provide under

11  the Licensing Agreement, and states, in all capital letters, "all features may require system

12  modification to be considered acceptable for deployment."  (Id. at 13-15.)

13        The Licensing Agreement referenced a possible change in control of

14  Selektpoints.  Section 2.4 of the Licensing Agreement provides as follows:

15        Licensor also confirms its knowledge of TII's plans to effect a change
          of control of its Loyalty Business through inviting in new investors,
16        and the Licensor agrees that the assignment or sub-licensing mentioned
          above in this subsection will be approved whether the change of
17        control comes about or not.

18  (Id.)  Holmes specifically negotiated for this provision.  (SCTN's Opp'n, Ex. 9 at 436.)

19        In September 2006, Buchan met Defendant Mark Bone-Knell ("Bone-Knell") at

20  a social function.  (Buchan Aff. at 7.)  Bone-Knell recommended TII file a patent on the

21  Selektpoints concept.  (Id.)  In October and November 2006, Bone-Knell and Buchan

22  discussed via email the cost estimate for filing patent applications in the United Kingdom

23  and the United States, and who should be listed as the inventors and owners on the patent

24  application.  (Pls.' MSJ, Exs. A19-A20.)  Buchan instructed Bone-Knell to file the

25  application in the name of a company called "Marlin" and to identify the inventors as

26  Buchan and Holmes.  (Pls.' MSJ, Ex. A20.)  TII's Chairman of the Board, Adnan Al-Bahar

("Al-Bahar"), approved the application, and Bone-Knell filed it in the United Kingdom in November 2006. (Buchan Aff. at 8; Pls.' MSJ, Ex. A10 at 164, Ex. B at 2.)  Although prior communications between Buchan and Bone-Knell referenced filing the patent application in Marlin's name, the patent application actually filed in the United Kingdom lists Menalco as the applicant. (Def. Bone-Knell's Reply to Pls.' Opp'n to Bone-Knell's Mot. Summ. J. (Doc. #308) ["Bone-Knell Reply"], Ex. A.)  The application does not list Buchan and Holmes as the inventors. (Id.)  Bone-Knell invoiced Menalco for his services related to this application on December 4, 2006, and Menalco paid for his services. (Bone-Knell Reply, Ex. C; Buchan Aff. at 8.)  Bone-Knell denies he ever filed a patent application identifying the inventors or owners as Buchan or Holmes. (Bone-Knell Reply, Decl. of Bone-Knell.)

During this time frame, Holmes and Buchan discussed with Bone-Knell that TII was "looking to sell" Selektpoints and they would welcome any advice or assistance in finding purchasers or funding partners. (Buchan Aff. at 9.)  According to Buchan, one reason TII needed to sell Selektpoints was because it would violate Sharia law for TII to operate Selektpoints. (SCTN Opp'n, Ex. 11 at 81-82.)  Sharia law instructs Muslims with respect to how to deal in money and investments, and it prohibits the receiving or paying of interest or dealing in futures, as well as making or profiting from anything that is harmful to human health. (Pls.' Reply to SCTN/Phoenix's Opp'n to Pls.' Mot. Summ. J. (Doc. #328) ["Pls.' Reply to SCTN Opp'n"], Ex. 2 at 166.)  According to Buchan, TII wanted to sell Selektpoints entirely, or to reduce TII's interest to a non-controlling interest, to avoid any conflict with Sharia law to the extent Selektpoints could be viewed as aiding and abetting unlawful banks, meaning banks which charge interest. (SCTN Opp'n, Ex. 11 at 81-82.)

However, TII's chief legal officer, Adnan Abrahim ("Abrahim"), testified Selektpoints was Sharia compliant because Sharia law does not forbid a company from dealing with a bank that charges interest so long as the deal between TII and the bank does not involve the charging of interest. (Pls.' MSJ, Ex. B; Pls.' Reply to SCTN Opp'n, Ex. 2

6

at 168-69.)  According to Abrahim, because Selektpoints was to charge fees and not

interest, it was Sharia-compliant.  (Pls.' MSJ, Ex. B.)  Abrahim denies TII ever considered

selling Selektpoints, either to comply with Sharia law or for business reasons.  (Pls.' Reply

to SCTN Opp'n, Ex. 2 at 172.)  However, according to Buchan, TII Chairman Al-Bahar

instructed him to find a buyer for Selektpoints and also to explore joint venture

opportunities for Selektpoints.  (Pls.' Reply to Buchan's Opp'n to Pls.' Mot. Summ. J.

(Doc. #290) [Pls.' Reply to Buchan Opp'n"], Ex. 1 at 38-39; SCTN Opp'n, Ex. 11 at 83.)

The record is devoid of any sworn testimony from Al-Bahar.

        In mid to late November 2006, Bone-Knell introduced Buchan to Defendants

Timothy Koster ("Koster") and Christopher Eddy ("Eddy"), who had formed Defendant

Convergence Capital Limited ("Convergence").  (Buchan Aff. at 10; SCTN Opp'n, Ex. 6 at

15.)  According to Eddy, Buchan told him that TII and Al-Bahar wanted to sell Selektpoints

because it was not Sharia-compliant.  (SCTN Opp'n, Ex. 6 at 46.)  Koster and Eddy entered

into a non-disclosure agreement with Menalco which Holmes signed on behalf of

TII/Menalco.  (Buchan Aff. at 10, Buchan Opp'n, Ex. E.)  Among the recitals in the non-

disclosure agreement was that the parties "desire to disclose proprietary information relating

to the potential commercial involvement of the Parties in the investment/procurement of

equity in a company involving Financial Services and/or Loyalty Services and Products."

(Pls.' MSJ, Ex. A24.)  On November 30, 2006, Holmes, Buchan, Koster, and Eddy held a

meeting at which Holmes reviewed an initial draft proposal for TII to sell Selektpoints.

(Buchan Aff. at 10.)

        On December 11, 2006, Koster and Eddy presented this proposal in person to Al-

Bahar and other TII senior staff.  (Id.; Buchan's Opp'n, Ex. F.)  The proposal was to

purchase Selektpoints from TII for $17 million through the formation of a new, as yet

unidentified company referred to as "NewCo."  (Buchan Aff. at 10-11; Exs. to Mot. to

Dismiss (Doc. #55), Ex. C.)  Along with the $17 million payment, TII also would receive a

thirty-five percent interest in NewCo.  (Buchan Aff. at 11.)  TII rejected the offer.  (Pls.'
MSJ, Ex. B at 5.)

According to Buchan, during the December 11 meeting, Al-Bahar explained that
Buchan and most of the other current Selektpoints employees would be employed with the
new company after a deal closed, while Holmes would continue to work for TII.  (Buchan
Aff. at 12; Pls.' Reply to Buchan Opp'n, Ex. 1 at 38-39.)  Buchan avers that Al-Bahar
instructed him to work with other businesses to prepare proposals because Buchan would be
on the "buy side" of any deal.  (Pls.' Reply to Buchan Opp'n, Ex. 1 at 39.)  Buchan worked
with Eddy and Koster in January to prepare a new proposal.  (Buchan Aff. at 13.)
According to Korakianitis, throughout this period he was instructed by Buchan; Michael
Darch ("Darch"), TII's controller; and Samuel Assaad ("Assaad"), Menalco's head of
business development for Selektpoints, to educate Koster and Eddy on the loyalty business
because they were working to put a strategy together to find investors for Selektpoints.
(SCTN Opp'n, Ex. 5 at 12, Ex. 7 at 27, 54-55, 57.)

On February 16, 2007, Convergence and Phoenix entered into a Mandate to Act.
(Countercl., Ex. 12.)  Pursuant to the Mandate to Act, Convergence had a one-year time
frame during which it would represent Phoenix for purposes of seeking capital investment
or buyers, be it through a deal with TII involving the spinoff of Selektpoints into a new
company holding both the Selektpoints program and the Phoenix technology rights, or
otherwise.  (SCTN Opp'n, Ex. 9 at 288-89; Countercl., Ex. 12; SCTN/Phoenix Opp'n to
Pls.' Mot. for Sanctions (Doc. #194), Ex. 1.)

On February 18, 2007, Koster and Eddy presented a second proposal in person to
Al-Bahar.  (Buchan Aff. at 12, 13; Buchan Opp'n Ex. G; Exs. to Mot. to Dismiss (Doc.
#55), Ex. D.)  Pursuant to the second proposal, SCTN, Phoenix, and two other companies,
Smart Marketing and Krako ("SMK") were to be included in the deal by having forty-nine
percent of these respective companies folded into NewCo along with Selektpoints.  (Buchan

Aff. at 13.)  TII was to receive between $200 million and $400 million after the strategic

investors invested.  (Id.)  Al-Bahar rejected the proposal but requested the deal be

restructured with TII receiving more benefit than Phoenix, SCTN, and SMK.  (Id. at 14.)

According to Buchan, Al-Bahar demanded they negate the value of SCTN and that the

proposal have a much lower return for SCTN.  (SCTN Opp'n, Ex. 11 at 174.)  Eddy and

Koster sent Al-Bahar a third proposal on February 21, which Al-Bahar again rejected.

(Buchan Aff. at 14; Buchan Opp'n, Ex. H; Exs. to Mot. to Dismiss (Doc. #55), Ex. E.)

According to Abrahim, TII never took the offer from Convergence seriously.  (Pls.' MSJ,

Ex. A10 at 174.)

        According to Buchan, following Al-Bahar's rejection of the third proposal,

Buchan worked with Koster and Eddy to prepare another proposal.  (Buchan Aff. at 14.)

This proposal was to involve formation of a new company, which previously had been

referred to as NewCo in the presentations but now was being called "CBData," to acquire

Selektpoints and either acquire the Phoenix/SCTN entities, or contract with them for a

software license.  (Id. at 14-15.)  According to Buchan, Al-Bahar encouraged exploration of

a joint venture with Convergence.  (Id. at 14.)  Buchan avers that Al-Bahar knew that upon

a deal being made, certain employees would go forward with the new company.  (SCTN

Opp'n, Ex. 11 at 123.)  According to Assaad, Holmes informed him that if a sale of

Selektpoints went through, Assaad would be on the "buy side," and would work thereafter

with the new organization. (Pls.' MSJ, Ex. A18 at 90-92.)  Assaad testified he discussed

these plans with Neil Smith, TII's Vice President of Business Development.  (Id. at 94-95.)

        On March 6, 2007, TII and Phoenix entered into additional licensing agreements

for other regions not included in the September 2006 Licensing Agreement, including

Europe, Asia, and South Africa.  (Countercl. at 32.)  Later that month, Al-Bahar sent an

email to Buchan, Holmes, and Darch, seeking to "improve" the licensing agreements with

Phoenix.  (SCTN Opp'n, Ex. 26.)  Al-Bahar suggested alterations to the areas covered by

the licensing agreements.  (Id.)  Additionally, he wanted to renegotiate the per transaction cost, stating the rate is "way too high" and "we may find it cheaper to take their competitor and finance them to build a better solution."  (Id.)  Buchan responded by arguing against a proposal to renegotiate the licensing terms with Phoenix, as they risked damaging their relationship with an important vendor.  (Id.)  Additionally, Buchan wrote that he was "troubled by trying to hold a gun to our most important vendor's head by trying to renegotiate a contract, that we signed in good faith, over a penny or at most, two."  (Id.)  In the email to Al-Bahar, Buchan made reference to "[t]he banks and companies interested in possible acquisition of us."  (Id.)

On April 9, 2007, Bone-Knell sent an email to SCTN/Phoenix principal Miki Radivojsa ("Radivojsa") discussing the strategy for assigning or licensing Phoenix's intellectual property to Newco.  (Pls.' Opp'n to Bone-Knell's Mot. Summ. J. (Doc. #291) ["Pls.' Opp'n to Bone-Knell"], Ex. 3.)  Bone-Knell requested information from Radivojsa as to what intellectual property would be included, and what advantages that software and functionality would provide to Newco over its competition.  (Id.)  Bone-Knell referred to the future entity as both Newco and "CBD."  (Id.)  Radivojsa supplied Bone-Knell with pertinent information on April 13.  (Id.)

In an April 23, 2007 email to Holmes and others, Al-Bahar stated that SCTN and its competitor, WRT, were in tight financial situations.  (SCTN Opp'n, Ex. 25.)  Al-Bahar directed his employees to "[t]hink strategically of how do we get max leverage, build a competitor to SCTN for us but not for everyone else, block the use of the software to direct competitors, etc."  (Id.)

On April 25, 2007, Radivojsa exchanged emails with Eddy, Koster, and Buchan discussing CBData's possible purchase of Phoenix.  (Pls.' MSJ, Ex. A27.)  As Eddy described the proposed structure of the deal, Buchan, Eddy, and Koster would form CBData.  (Id.)  Phoenix, Smart Marketing, Airos, and Krako would grant CBData purchase

options, which CBData could exercise upon receipt of funds from strategic global investors. (Id.)  Radivojsa thereafter sent an email to Korakianitis expressing concerns with the proposed deal, including that Eddy and Koster had no risk exposure while others had invested significant time and money, that Eddy and Koster may not be able to deliver, and that Koster and Eddy were trying to sidestep dealing with SCTN because SCTN was a publicly held company which would require a tender offer.  (Pls.' MSJ, Ex. A28.)

On April 29, 2007, Consumer Behavioural Data Corporation Limited ("CBData") was incorporated in the Cayman Islands.  (Buchan Aff. at 14; Pls.' MSJ, Ex. A26.)  Koster was CBData's sole shareholder.  (Buchan Aff. at 15.)  That same date, Bone-Knell sent an email to Radivojsa, Koster, and Eddy, stating he has been "tasked with identifying and recording a detailed listing of the actual IP currently held or under development in the three privately held companies which are intended to be rolled up into Newco (i.e. Airos, Smart Marketing etc)."  (Pls.' MSJ, Ex. A26.)  CBData sought to identify intellectual property rights owned by these companies that potentially could be assigned to CBData so CBData could inform investors about the intellectual property protection that could be afforded to investors in CBData.  (Buchan Aff. at 15.)

In late May 2007, Radivojsa, Buchan, Eddy, and Koster discussed a deal for CBData to purchase Phoenix and SMK, and discussed drafting a memorandum of understanding ("MOU").  (Pls.' MSJ, Exs. A33-34.)  In an email discussing the drafting of the MOU, Radivojsa stated, "we also want to make sure that the TII issue is deal[t] with fairly (ie [sic] there is some buyout of selektpoints, agreement with Adnan, . . .) so we will add some points in MOU about that as well.  Without that being addressed, we will not proceed."  (Id.)  Eddy responded, "We always contemplated making Adnan an offer for Selektpoints – it[']s in all of the deal diagrams we have proposed.  We will propose a fair deal to him and hopefully he will be a seller."  (Id.)

///

The draft MOU provided for CBData to execute a non-exclusive licensing agreement with Phoenix.  (Pls.' MSJ, Ex. A33.)  As part of this non-exclusive licensing agreement, provision would be made "for legal costs, judgements [sic] if TII launches legal action against Phoenix since TII is a customer of Phoenix, and CBD and TII may have the same target customers."  (Id.)  A valuation would be completed of Phoenix, SCTN, Airos, Krako, and Ravient, and Phoenix was to present to CBData an option to purchase these companies.  (Id.)  CBData was to procure from TII "a guarantee from TII that it will not start legal action against any parties listed in the 'Parties' section with respect to this transaction.  TII is a customer of Phoenix, and CBD and TII may have the same target customers and legal action may be started."  (Id.)  Although the MOU identified TII as a party to the agreement, the draft MOU had no signature line for a TII representative.  (Id.) The MOU never was signed or executed by the parties.  (Id.; SCTN Opp'n, Ex. 6 at 76.)

Korakianitis testified that he thought Al-Bahar knew of CBData and the various buyout proposals.  (SCTN Opp'n, Ex. 7 at 174, 307.)  Korakianitis also testified that Radivojsa would not move forward with such a deal without TII's participation, even though Phoenix's licensing agreement with TII was non-exclusive and Phoenix could have worked with CBData anyway.  (Id. at 307-08.)  Radivojsa likewise testified that Phoenix and SCTN always understood that TII/Menalco was aware of CBData's existence and approved of its efforts.  (SCTN/Phoenix Opp'n to Pls.' Mot. for Sanctions (Doc. #194), Ex. 1.)  Radivojsa also testified he never had any reason to believe Buchan did not have authority to act on behalf of Selektpoints.  (SCTN's Opp'n, Ex. 9 at 491, 494.)

In the meantime, TII ceased paying Phoenix for its invoices beginning in May 2007.  (Countercl. at 47.)  In June, Phoenix began to request payment of its invoices.  (Id.) TII sent Yzelle DeWet ("DeWet"), a TII corporate representative, to SCTN's facilities "to determine the nature of SCTN's activities and bills on behalf of TII."  (Pls.' MSJ, Ex. B at 3; Countercl. at 56.)  At the end of the trip, DeWet requested that the Licensing Agreement

be changed to reduce Phoenix's fees and to make the contract exclusive.  (Countercl. at 57.)

Throughout June, July, and August, Phoenix questioned TII on when it would be paid on the outstanding invoices.  (Id. at 47-48.)  TII responded through various emails suggesting the invoices would be paid shortly.  (Id. at 47-49; SCTN Opp'n, Exs. 18-20.)  As late as August 14, TII confirmed it would pay by August 30.  (Countercl. at 49.)  Throughout this period, Phoenix continued to provide services to TII, including providing training videos, user guides, and technical support.  (Id. at 58-60.) According to Phoenix, it is owed $1,466,731.61 in unpaid invoices.  (Id., Ex. 10.)

Meanwhile, between May and August 2007, CBData planned fund raising presentations to financial institutions.  (Buchan Aff. at 16.)  For example, on May 29, Koster sent an email to individuals at Google with a proposal regarding CBData and stated CBData is "now positioned to be one of the largest global providers of consumer behavioral data."  (Pls.' Reply to Bone-Knell's Opp'n to Pls.' Mot. Summ. J. (Doc. #313), Ex. 6.)  CBData also made a proposal to MasterCard.  (Id., Ex. 7 at 225.)  CBData also entered into non-disclosure agreements with various financial institutions.  (Buchan Aff. at 16; Buchan Opp'n, Ex. I.)  According to Buchan, the presentations indicated that CBData had not yet acquired Selektpoints and that the purchase of Selektpoints was a key element to CBData's business strategy.  (Buchan Aff. at 17.)

Assaad testified he attended at least one presentation given to an entity called Duke Equity during which it was represented that Assaad was a TII employee, but that he would be moving forward with CBData when the deal went through.  (Pls.' MSJ, Ex. A18 at 93-94.)  According to Assaad, he worked on CBData material while being paid by TII because he understood CBData "was the company facilitating this big deal for Mr. Al-Bahar, so certainly any work that I would have done would have been for TII or the greater good thereof."  (SCTN Opp'n, Ex. 5 at 122-23.)  Assaad further testified he had a CBData business card, email address, and the title of Vice President Global Sales for

13

CBData because "that was the perceived management team that was going to be going forward with the new organization." (Pls.' MSJ, Ex. A18 at 90.) Assaad testified he understood that Al-Bahar and others at TII knew about CBData. (Id. at 90-92.) Buchan likewise avers he worked with CBData and engaged in activity to secure investment and joint ventures for Selektpoints as a liaison for TII/Menalco. (Buchan Aff. at 17.)

Efforts also were directed at obtaining a patent for CBData and for creating CBData contracts. For example, Bone-Knell filed a patent application with the United Kingdom patent office on June 14, 2007 in CBData's name. (Pls.' MSJ, Ex. A30.) The patent describes a–

> method, system and apparatus for implementing a consumer incentive program which provides for the capture, transmission and storage of consumer transaction information, and the subsequent analysis of said information to provide consumer behavioral data to participating incentive scheme Transaction Entities, Issuing Institutions, Device issuing companies or third parties to thereby enable the identification of specific persons, consumers and/or groups of consumers meeting specific consumer profile criteria to which subsequent marking and sales campaigns and the like can be targeted.

(Bone-Knell Reply, Ex. F.) Buchan testified he would not be surprised to learn that the patent Bone-Knell applied for on Menalco's behalf in November 2006 was similar to the patent application Bone-Knell applied for on CBData's behalf in June 2007. (Pls.' Opp'n to Bone-Knell, Ex. 4 at 206.) According to Buchan, both patent applications are similar to applications filed by other companies such as American Express. (Id.) In mid July, Bone-Knell sent an email to Buchan discussing Bone-Knell's efforts at modifying a generic master agreement forwarded to him "into a format which looks sufficiently different from its original form, acceptable by the Banks/Financial Institutions and ensures CBD's ability to enforce its rights." (Pls.' Opp'n to Bone-Knell, Ex. 5.)

Throughout the period, Buchan, Holmes, and other Selektpoints employees used personal email addresses as opposed to their TII or Selektpoints email addresses when discussing CBData business. According to Assaad, he, Buchan, and other Selektpoints/TII

employees sometimes needed to use their personal email addresses because the Selektpoints email server often was not in operation.  (Pls.' MSJ, Ex. A18 at 109-11.)  In an August 24, 2007 email, Assaad asked another Selektpoints employee, Doug Sutherland, "Can they monitor . . . things like hotmail or yahoo e-mails as well?"  (Id. at 209.)  According to Assaad, by "they" he meant TII's wholly owned subsidiary, Procco, which was a processing center.  (Id. at 209-10.)  According to Assaad, he was not concerned about the email monitoring in an effort to hide his communications regarding CBData from Al-Bahar because "Al-Bahar knew that there was a deal going forward.  He sought the deal.  He engaged the individuals that went out to go get the deal.  He had me provide sensitive, highly sensitive, information to these individuals."  (Id. at 223.)  Rather, Assaad testified he was concerned the individuals at Procco would monitor his emails because those particular people did not know Selektpoints was for sale.  (Id. at 211.)

According to Abrahim, at a July 2007 TII executive management strategy meeting, Buchan claimed to have more than 200 merchants signed up for Selektpoints.  (Pls.' MSJ, Ex. A10 at 129.)  However, senior management was concerned about these representations because Buchan had made similar comments before but had never shown them a list of merchants and Buchan could not provide the list when asked at the meeting.  (Id. at 130, 131-32.)  TII thereafter initiated an internal investigation.  (Pls.' MSJ, Ex. B at 3.)

According to Abrahim, TII did not discover Koster, Eddy, and Buchan formed CBData until the summer of 2007.  (Id. at 5.)  Abrahim also avers that this investigation revealed that SCTN paid Buchan a "series of secret unlawful payments" from SCTN/Phoenix to Buchan.  (Id. at 3.)  However, Buchan and Korakianitis testified that the payments were not from SCTN or Phoenix.  Rather, the payments were from Korakianitis to Buchan for unpaid work Buchan performed for a company Korakianitis used to own.  (Buchan Aff. at 2; SCTN Opp'n, Ex. 7 at 152-54.)  Buchan and Korakianitis deny the

payments were related to SCTN/Phoenix other than that when Korakianitis received

payment from SCTN/Phoenix, he would use that money to pay Buchan on the prior

obligation.  (Pls.' MSJ, Ex. A9 at 159.)  According to Korakianitis, SCTN/Phoenix had no

knowledge of these payments, and he would pay Buchan out of other funds he received

from sales commissions he received from other companies as well.  (Id. at 159-60; SCTN

Opp'n, Ex. 7 at 152-53, 160.)  Radivojsa denied he knew about or approved payments from

SCTN/Phoenix to Buchan.  (SCTN Opp'n, Ex. 9 at 529.)

On August 28, 2007, CBData was scheduled to make a presentation to a potential

investor, Signature Group.  (Pls.' Opp'n to Bone-Knell, Ex. 4 at 212-13.)  Although this

was CBData's first presentation, CBData had non-disclosure agreements with other

companies, such as The Fund, LLC.  (Id. at 213.)  In an August 24, 2007 email, Koster

stated he would be enclosing with three separate emails the McKinsey Report,[2] the Pepper

Corporation analysis,[3] and "financials" with First Data Corp under CBData's name.  (Pls.'

Reply to Bone-Knell's Opp'n to Pls.' Mot. Summ. J. (Doc. #313), Ex. 10.)

In August 2007, Buchan was arrested by Dubai police.  (Buchan Aff. at 17.)  A

few days later, Buchan was suspended from work with Plaintiffs, as was most of the

Selektpoints personnel.  (Id.)  Buchan attempted to leave Dubai but was stopped at the

airport and arrested.  (Id. at 18.)  Buchan spent three weeks in jail before leaving the

country.[4]  (Id.)  Abrahim states that while Buchan was being investigated by the authorities

---

[2] McKinsey & Company performed an assessment on the Selektpoints program to see if it was
viable and to value the program.  (SCTN Opp'n, Ex. 5 at 41, Ex. 33.)

[3] The Pepper Corporation carried out a global assessment for Selektpoints.  (SCTN Opp'n, Ex.
15 at 222-23.)

[4] Plaintiffs offer as an exhibit a purported copy of a Dubai court decision finding Buchan stole
Selektpoints from Plaintiffs.  (Pls.' MSJ, Ex. B1.)  Buchan objects to the document.  The Court will
not consider this document.  It is hearsay and is not a certified government document.  Further, the
document appears to be a Microsoft Word document entitled "Robert Buchan Conviction-

in Dubai, "certain banks discontinued their business relationship with TII and Menalco." (Pls.' MSJ, Ex. B at 3.)

On August 30, 2007, TII/Menalco filed suit in this Court against Buchan, Holmes, Koster, Eddy, Bone-Knell, Convergence, SCTN, Phoenix, and CBData.  (Compl. (Doc. #1).)  TII/Menalco generally asserts these Defendants conspired to misappropriate Selektpoints for their own use under the CBData name.  TII/Menalco brings claims for federal and state civil Racketeer Influenced and Corrupt Organizations Act ("RICO") violations, misappropriation of trade secrets, civil conspiracy, fraud, breach of contract, breach of fiduciary duty, unjust enrichment, and unfair competition.

On September 5, Eddy sent Al-Bahar and Abrahim a proposal entitled "Re: Amended Proposal for Menalco/Selektpoints ('Transaction')."  (Pls.' Reply to Bone-Knell's Opp'n to Pls.' Mot. Summ. J. (Doc. #313), Ex. 14.)  The proposal referred to the two prior proposals and suggested that at a prior meeting, Al-Bahar requested Convergence come back with a simpler proposal.  (Id.)  The new proposal identifies Newco as CBData, and the proposal states that CBData has made presentations to strategic global investors to "flesh out interest in a simplified Transaction format."  (Id.)

In September 2007, an article appeared in MoneyWorks magazine regarding Selektpoints.  (Buchan's Opp'n, Ex. J.)  The article describes the Selektpoints program, including that it is a global merchant funded program, that it utilizes the landlord bank concept with one landlord bank, that it collects detailed transaction information such as stock keeping unit information, and administers direct marketing campaigns.  (Id.)  The article also describes the various revenue streams a landlord bank could expect under Selektpoints, what the merchant could expect to pay, and how much a consumer could expect to earn in rewards points.  (Id.)  Additionally, the article identified three landlord

English.doc," suggesting it is a translation, with no verification that it is a true and accurate translation of the original.

banks that had signed up with Selektpoints.  (Id.)

According to Abrahim, the plans for Selektpoints were confidential and not intended to be shared outside TII.  (Pls.' MSJ, Ex. B at 2.)  In contrast, Buchan testified that Al-Bahar never told him not to disclose how much Selektpoints pays per card, and all critical parts of the business model were disclosed by the MoneyWorks article and by other public presentations.  (SCTN Opp'n, Ex. 8 at 264-67.)  According to David Parker of Pepper Corporation, which carried out a global assessment for Selektpoints, the details on Selektpoints were made public through presentations at conferences and in the MoneyWorks article.  (Id., Ex. 15 at 222-23.)

Prior to filing the Complaint in this action, TII did not communicate to Phoenix or SCTN that it thought Phoenix/SCTN was in breach of the Licensing Agreement. (Countercl. at 35; SCTN Opp'n, Ex. 9.)  According to Buchan, the general consensus at TII was that TII/Menalco was satisfied that SCTN had provided the technology.  (SCTN Opp'n, Ex. 11 at 316-17.)  According to Radivojsa, SCTN completed work on the initial development for Selektpoints by August 30, 2007, and besides some "tweaking," the project was ready to go forward from SCTN's perspective.  (Id., Ex. 9 at 397, 519.)  According to Buchan, SCTN timely performed its contractual obligations related to the launch of the Selektpoints program.  (Pls.' MSJ, Ex. A8 at 108.)  However, according to Abrahim, SCTN never completed adapting the program to Selektpoints' needs.  (SCTN Opp'n, Ex. 24 at 143-44.)

On September 12 and 14, 2007, SCTN/Phoenix sent demand letters to TII requesting the return of the SCTN/Phoenix technology from TII and any of its subsidiaries, business partners, or any other party who had received the technology through TII. (Countercl. at 36.)  SCTN/Phoenix thereafter filed Counterclaims against TII/Menalco and Cross-claims against Buchan, Holmes, Koster, Eddy, Bone-Knell, Convergence, and CBData.  (Ans., Countercls. & Crosscls. (Doc. #19).)  SCTN/Phoenix generally allege these

18

Counter and Cross Defendants conspired to devalue SCTN/Phoenix and withhold payment on invoices to take advantage of SCTN's weak financial position to obtain the SCTN technology at a reduced price.  SCTN/Phoenix also allege TII/Menalco has failed to pay all sums due under the Licensing Agreement.  SCTN/Phoenix bring claims for breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, conversion, fraud, negligent misrepresentation, misappropriation of trade secrets, federal and state civil RICO, civil conspiracy, unfair trade practices, and intentional interference with prospective economic advantage.

Defendants Buchan and Bone-Knell now move for summary judgment on Plaintiffs' claims for federal and state RICO violations, misappropriation of trade secrets, and civil conspiracy.  Plaintiffs move for summary judgment on their own claims for federal and state civil RICO, civil conspiracy, misappropriation of trade secrets, breach of contract, and breach of fiduciary duty.  Plaintiffs also move for summary judgment on SCTN's counterclaims for misappropriation of trade secrets, conversion, intentional interference with prospective economic advantage, and the various claims related to breach of the Licensing Agreement.[5]

## II. OBJECTIONS

Defendants SCTN and Phoenix object to Plaintiffs' exhibits A1, A3-A7, A11, A13-A17, A19-48, A50-A57, A64, and A66-A69 as unauthenticated.  Defendants argue an affidavit from Plaintiffs' counsel stating that the various exhibits were items produced in discovery is insufficient to authenticate the documents.  Plaintiffs respond that they sufficiently have authenticated the various exhibits through the attorney's affidavit.

---

[5] No party moves for summary judgment on count four (fraud) or eight (unjust enrichment) of Plaintiffs' Complaint.  Plaintiffs move for summary judgment on counts fourteen through seventeen of SCTN/Phoenix's Counterclaim.  However, these counts are forms of relief, not separate theories of liability.

The Court "can consider only admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e)).  Exhibits must be authenticated to be admissible.  Id. Authentication is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  Documents authenticated through personal knowledge must be attached to an affidavit that meets the requirements of Federal Rule of Civil Procedure 56(e).  Orr, 285 F.3d at 773-74.  Additionally, the affiant must be a person through whom the exhibits could be admitted into evidence.  Id. Documents produced in discovery are deemed authentic when offered by a party opponent. Id. at 777 & n.20.  The production in response to a discovery request acts as a judicial admission that the documents are authentic.  Id.  "[W]hen a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity."  Id. at 776.

Plaintiffs' counsel states in her affidavit that exhibits A1 through A69 were "produced or exchanged in the course of this litigation."  (Pls.' MSJ, Aff. of Colleen M. Coyle at 2.)  Plaintiffs' counsel identifies which documents were produced by which party by reference to the different Bates numbers used by each party.  (Id.)

The Court will overrule the objection to exhibits A11, A27, A28, A33, A34, and A64 as these documents were produced by SCTN/Phoenix in the course of discovery, and thus SCTN/Phoenix admitted their authenticity.  The Court also will overrule the objection to exhibits A1, A19-A24, A26, A29, A30, A45, A47, and A53-A56.  Although these exhibits were produced by Defendant CBData and not Phoenix or SCTN, CBData produced them in response to discovery requests and has not denied their authenticity.  Because the exhibits are authenticated as to one party, they are authenticated as to all.  Further, SCTN and Phoenix do not dispute these documents are authentic, they argue only that Plaintiffs

have failed to authenticate them.

However, Plaintiffs cannot authenticate documents they produced in discovery by stating through an attorney affidavit that the materials were produced in discovery and hence are authentic, as this would not constitute an admission because the exhibits were not offered by a party opponent.  Plaintiffs provide no basis for counsel to have personal knowledge as to the authenticity of Plaintiffs' documents.  The Court therefore will sustain the objection to exhibits A3-A7, A13-A17, A25, A31, A32, A35-A44, A46, A48, A50-A52, and A66-A69.  The Court will not consider these documents in deciding the summary judgment motions.

The Court also will sustain the objection to exhibit A57.  The document is not marked with any Bates number, and hence it is not clear that this document was produced in discovery, and if it was, by which party.  It does not appear to be a document produced in discovery, but rather appears to be a letter from Plaintiffs' counsel to the former counsel for SCTN and Phoenix.  Plaintiffs do not otherwise attempt to authenticate this exhibit.

In response to SCTN's and Phoenix's objections, Plaintiffs argue that SCTN's and Phoenix's exhibits 12, 13, 16, and 22 likewise are not authenticated.  The Court will sustain the objection to these exhibits.  SCTN and Phoenix have not authenticated these exhibits, and the exhibits were produced by SCTN and Phoenix in discovery, not by a party opponent.

## III. DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the

non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

**A.  Plaintiffs' Federal Civil RICO Claims  - Counts 1-2 of the Complaint**

In count one of the Complaint, Plaintiffs allege Defendants were participants in an associated-in-fact enterprise engaged in a scheme to defraud through the formation of CBData and marketing Plaintiffs' trade secrets to others in the industry as CBData's, thereby fraudulently obtaining Selektpoints and related TII/Menalco trade secrets for themselves.  Plaintiffs allege as predicate acts mail and wire fraud prohibited by 18 U.S.C. § 1341 and § 1343.  Plaintiffs contend Defendants used the mails and wires to make false representations for the purpose of misappropriating and profiting from Plaintiffs' proprietary business information and trade secrets.  In count two, Plaintiffs allege Defendants conspired to engage in this racketeering activity.

Buchan moves for summary judgment on this claim, arguing Plaintiffs have failed to produce evidence that Buchan agreed to join in a conspiracy or to commit predicate acts.  Bone-Knell also moves for summary judgment, arguing he was not a participant in an enterprise, and he did not act in a directing capacity in any such enterprise. Bone-Knell also argues Plaintiffs have not shown that Bone-Knell agreed to join a conspiracy or to commit predicate acts.

Plaintiffs respond that while Buchan references the Complaint, the evidence adduced during discovery demonstrates Buchan was a central figure in an associated-in-fact enterprise that included Buchan, Bone-Knell, CBData, SCTN, and Phoenix.  Plaintiffs contend the facts demonstrate these co-conspirators agreed to form an enterprise to

misappropriate Selektpoints, and they facilitated the commission of predicate acts using the mail and wires, including misappropriating Plaintiffs' marketing materials and contracts for CBData's use, soliciting investors for CBData, and communicating about opportunities for CBData.

Plaintiffs also argue the evidence demonstrates Bone-Knell was a participant in the enterprise-in-fact, and that he performed acts in support of the enterprise, including filing a patent application in CBData's name for the same concept for which he previously had filed an application in Menalco's name, and communicated with the other alleged co-conspirators about certain language in presentations and contracts. Plaintiffs also argue Bone-Knell need not have directed activity to be liable under RICO, but that he nonetheless engaged in substantial activity, such as filing the patent application in CBData's name and taking other steps to get the misappropriated trade secrets to market for CBData.

Plaintiffs also move for summary judgment on their federal RICO claims, arguing the evidence shows Defendants were involved in a scheme to defraud Plaintiffs out of the Selektpoints concept. Plaintiffs argue Defendants participated in an association-in-fact enterprise that was designed to misappropriate Plaintiffs' trade secrets and present them as Defendants' own property. As for predicate acts, Plaintiffs contend Defendants committed mail and wire fraud by using email to communicate regarding opportunities for CBData and to make false representations to Plaintiffs regarding Defendants' progress on and intentions with respect to Selektpoints.

Defendant Bone-Knell responds that Plaintiffs' evidence does not support Plaintiffs' argument that Bone-Knell participated in any scheme to defraud Plaintiffs out of Selektpoints, and the evidence presented regarding Bone-Knell's participation is false. Defendant Buchan responds that Plaintiffs seek summary judgment on claims which ordinarily are not suitable for summary judgment, as they necessarily are fact intensive and involve questions of intent and state of mind. Further, Buchan disputes he was engaged in

any scheme to defraud Plaintiffs.  Rather, he was engaged in fulfilling Plaintiffs' request that he seek out potential purchasers or joint venture opportunities for the Selektpoints program, and he did so at Plaintiffs' request and on Plaintiffs' behalf.

Defendants SCTN and Phoenix respond by arguing genuine issues of material fact remain regarding whether TII intended to sell Selektpoints, and directed Eddy, Koster, and Buchan to present them with proposals and/or arrange for Selektpoints to be marketed globally via a new entity.  Further, SCTN and Phoenix argue that even if TII could show Buchan, Eddy, Koster, and Bone-Knell conspired against TII, no evidence in the record shows SCTN or Phoenix knew about or participated in the conspiracy.  Finally, SCTN and Phoenix argue Plaintiffs have failed to demonstrate concrete financial loss.

Pursuant to 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." RICO provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).  "To have standing under § 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by reason of' the RICO violation, which requires the plaintiff to establish proximate causation." Canyon County v. Syngenta Seeds, Inc., 519 F.3d 969, 972 (9th Cir. 2008).  A plaintiff asserting injury to business or property must show "concrete financial loss" resulting from "a harm to a specific business or property interest–a categorical inquiry typically determined by reference to state law." Id. at 975 (quotations omitted).

To prevail on a federal civil RICO claim, a plaintiff must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" Living Designs,

Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (quotation omitted).  Pursuant to § 1962(d), it is unlawful to conspire to commit a violation of § 1962(c).

To satisfy the first element, a defendant "must participate in the operation or management of the enterprise itself."  Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).  Conduct "requires an element of direction."  Walter v. Drayson, 538 F.3d 1244, 1247 (9th Cir. 2008) (quotation omitted).  The defendant need not be "upper management" to conduct the enterprise's affairs, as an enterprise is "'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  Reves, 507 U.S. at 184.  However, simply providing services to the enterprise without an element of direction is insufficient.  Walter, 538 F.3d at 1249.

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  A plaintiff pleads an enterprise through allegations of "an ongoing organization, formal or informal," and by allegations that "the various associates function as a continuing unit."  Odom v. Microsoft Corp., 486 F.3d 541, 549 (9th Cir. 2007) (en banc) (quotation omitted).  An organization is ongoing if it "is a vehicle for the commission of two or more predicate crimes."  Id. at 552 (quotation omitted).  Allegations that the organization existed over a two-year timespan suffices to allege it is a continuing unit.  Id.  Where the plaintiff alleges an associated-in-fact enterprise, the plaintiff need not allege "any particular organizational structure, separate or otherwise."  Id. at 551.

A plaintiff establishes a pattern of racketeering activity by showing the participants in the enterprise committed at least two acts of racketeering.  Id. at 552; 18 U.S.C. § 1961(5).  To prove a pattern of racketeering activity, the plaintiff must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued

criminal activity." <u>H.J. Inc. v. N.W. Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989).  Predicate acts are related if they have similar "purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." <u>Id.</u> at 240 (quotation omitted).

As to continuity, a plaintiff must show either a closed period of repeated conduct, or past conduct that by its nature projects into the future with a threat of repetition.  <u>Id.</u> at 241.  "Continuity does not require a showing that the defendants engaged in more than one 'scheme' or 'criminal episode.'" <u>Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.</u>, 833 F.2d 1360, 1363 (9th Cir. 1987).  However, the circumstances in any particular case may demonstrate the predicate acts do not amount to a threat of continuing activity.  <u>Id.</u>

Racketeering activity includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . which is chargeable under State law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).  Racketeering activity also includes a variety of specified federal crimes, including mail and wire fraud.  <u>Id.</u> § 1961(1)(B).  To state the elements of wire or mail fraud, the plaintiff must allege (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the mails or wires in furtherance of the scheme; and (3) the defendants acted with the specific intent to deceive or defraud.  <u>Miller v. Yokohama Tire Corp.</u>, 358 F.3d 616, 620 (9th Cir. 2004); <u>United States v. Manion</u>, 339 F.3d 1153, 1156 (9th Cir. 2003).  The mails or wires are used in furtherance of a scheme even if use of the mails or wires is not an "essential element" of the fraudulent the scheme, so long as it is "a step in the plot." <u>United States v. Shipsey</u>, 363 F.3d 962, 971 (9th Cir. 2004) (quotation omitted).

Finally, to establish causation, the plaintiff must allege he was injured "by reason of" the defendant's alleged racketeering activity.  <u>Living Designs, Inc.</u>, 431 F.3d at 362-63.  The plaintiff therefore must allege the defendant's conduct proximately caused the

plaintiff's injury.  Poulos v. Caesars World, Inc., 379 F.3d 654, 666 (9th Cir. 2004).

1.  Buchan's and Bone-Knell's Motions for Summary Judgment

The Court will grant Buchan's and Bone-Knell's motions for summary judgment on these claims.  Plaintiffs have failed to present evidence raising a genuine issue of material fact that Defendants' alleged predicate acts satisfy the continuity requirement.  Defendants' conduct involved a single alleged fraud against a single victim.  Upon Defendants successfully appropriating Selektpoints for their own benefit, the alleged scheme would be complete.  Plaintiffs present no evidence Defendants intended to defraud any other companies out of intellectual property or otherwise were committing or threatening to commit other fraudulent acts.  Thus, "although [Plaintiffs] allege[] a number of 'acts,' [Defendants'] collective conduct is in a sense a single episode having the singular purpose of [misappropriating Selektpoints], rather than a series of separate, related acts."  Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1535 (9th Cir. 1992) (holding allegations that the plaintiff's former employer took retaliatory actions against him for being a whistleblower did not state a pattern of racketeering activity); see also Medallion Television Enters., Inc., 833 F.2d at 1363-64 (holding threat of continuing illegal activity was lacking where the case involved a single fraud with a single victim based on allegations that the defendant attempted to induce the plaintiff to form a joint venture to obtain broadcast rights).

Moreover, Plaintiffs have failed to show injury or damages with admissible evidence.  In their opposition, Plaintiffs cite only to their expert report in support of their argument that they have established harm to TII's business.  (Pls.' Opp'n to Buchan at 6; Pls.' Opp'n to Bone-Knell's Mot. Summ. J. at 7.)  The Court will not consider the expert report, as it is hearsay.  Plaintiffs therefore have failed to present admissible evidence raising a genuine issue of material fact as to injury or damages for this claim.  Because Plaintiffs had reasonable notice that the sufficiency of their claim was at issue based on

27

Defendants Buchan and Bone-Knell challenging the claim on these bases, the Court <u>sua</u>
<u>sponte</u> will grant summary judgment in favor of Defendants SCTN and Phoenix on this
claim as well.  <u>See</u> <u>Oluwa v. Gomez</u>, 133 F.3d 1237, 1239 (9th Cir. 1998).

2.  Plaintiffs' Motion for Summary Judgment

Because the Court will grant Defendants' motion for summary judgment on these
claims, the Court will deny Plaintiffs' motion for summary judgment.  Further, even if the
Court were not granting Defendants' motion for summary judgment as to these claims, the
Court still would deny Plaintiffs' motion.  Defendant Buchan denies under oath he
participated in any scheme to defraud Plaintiffs of Selektpoints.  He avers that he worked at
all times in Plaintiffs' interest and at Plaintiffs' direction to obtain offers to purchase or
joint venture opportunities for Selektpoints.  Because Buchan's intent is an essential
element of the alleged predicate acts of mail and wire fraud, a genuine issue of material fact
remains for trial, and Plaintiffs are not entitled to summary judgment as to Defendant
Buchan.

As for Defendant Bone-Knell, Buchan's denial that he participated in a
conspiracy to steal Selektpoints from Plaintiffs raises a genuine issue of material fact for
Bone-Knell as well.  As Plaintiffs have framed the facts, Buchan was the key individual in
the alleged conspiracy, and thus his denial of any such scheme to defraud raises a genuine
issue of material fact regarding Bone-Knell's participation in any such scheme.

Additionally, many of the facts which Plaintiffs cite to support their federal
RICO claims against Bone-Knell are not supported by the evidence.  Plaintiffs assert they
paid Bone-Knell's "bills" believing he was providing services to Plaintiffs when he was
not.  However, the evidence shows Bone-Knell submitted only one bill to Plaintiffs for
filing the patent application in the United Kingdom, which he filed under Plaintiff
Menalco's name.  Additionally, while Plaintiffs contend Bone-Knell filed the patent
application listing Holmes and Buchan as the inventors, the evidence Plaintiffs cite consists

of an email string between Buchan and Bone-Knell discussing in whose name the patent should be filed.  The actual patent application Bone-Knell filed is in Menalco's name and does not list Buchan and Holmes as the inventors.  Plaintiffs also contend Bone-Knell filed a patent application in the United States listing Buchan and Holmes as inventors.  However, the evidence cited again consists only of an email string discussing a possible application in the United States.  Bone-Knell denies he ever made such a filing, and Plaintiffs present no evidence to the contrary.  Moreover, the email string identifies Menalco as the "proprietor," thus raising an issue of fact as to whether Bone-Knell was acting in Plaintiffs' interest in any efforts to obtain a patent in the United States, rather than in furtherance of a conspiracy to deprive Plaintiffs of Selektpoints.

As to Defendants SCTN/Phoenix, a genuine issue of material fact remains regarding their participation in any alleged scheme to defraud.  Buchan denies any such scheme to defraud existed.  Radivojsa, SCTN/Phoenix's principal, testified he believed TII/Menalco knew about and approved of the efforts of Buchan, Koster, and Eddy to prepare purchase or joint venture proposals for Selektpoints.  Further, Radivojsa and Korakianitis both testified that Radivojsa would not move forward with a deal involving Phoenix and CBData without TII's participation, as reflected in the email string discussing a potential MOU between CBData and Phoenix.  Radivojsa also testified he never had any reason to believe that Buchan was not acting on Selektpoints' behalf.

Genuine issues of material fact remain regarding whether Defendants engaged in any predicate acts involving use of the mails or wires in a scheme to defraud.  Whether Defendants acted with the requisite intent generally is a question of fact, particularly where Defendants have denied such intent under oath.  The Court therefore will deny Plaintiffs' motion for summary judgment on counts 1 and 2 of their Complaint.

///

///

### B.  Plaintiffs' Nevada Civil Rico Claims - Counts 6 & 7 of the Complaint

In count six of the Complaint, Plaintiffs allege violations of Nevada's civil RICO statute, alleging the same enterprise as the federal civil RICO claim.  In count 7, Plaintiffs allege Defendants conspired to violate the Nevada civil RICO statute.

Buchan moves for summary judgment on this claim, arguing Plaintiffs cannot show Buchan engaged in two predicate acts, or that his actions caused any injuries to Plaintiffs.  Bone-Knell also moves for summary judgment, arguing Plaintiffs cannot show he made any misrepresentations, or that he took any actions that caused injuries to Plaintiffs, as Plaintiffs have no evidence they ever departed with money under false pretenses.

Plaintiffs respond that Buchan engaged in at least two predicate acts of obtaining money through false pretenses or taking property from another under circumstances not amounting to robbery.  Specifically, Plaintiffs contend Buchan misappropriated the Selektpoints trade secrets and used them for his own financial gain, falsely filed a patent application indicating CBData owned Plaintiffs' trade secrets, induced TII to contract with SCTN by falsely representing SCTN's software was fully developed and received a payment from SCTN in return, and received his salary from TII by falsely representing he was devoting his time exclusively to TII and keeping confidential TII's information.  Plaintiffs contend they have produced evidence of damages, including payments to SCTN and Bone-Knell, and from its continued contractual relationships with Defendants, which involved paying sums of money to Defendants.

Plaintiffs contend Bone-Knell engaged in predicate acts by taking TII's trade secrets and filing a false patent application stating CBData owned the trade secrets, submitting invoices to TII for payment when he was not working in TII's interests, and taking TII's contracts and copying them with slight alterations for CBData's use.  Plaintiffs also contend they parted with money as a result of Bone-Knell's misrepresentations that he

was working to promote Selektpoints on TII's behalf by providing Bone-Knell with

confidential information, paying his invoices, and continuing the contractual relationship

with Defendants.  Plaintiffs also move for summary judgment on this claim, arguing the

evidence demonstrates Defendants engaged in a conspiracy to obtain Selektpoints for their

own use.

Nevada law makes it unlawful for a person:

> (b) Through racketeering activity to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.
> (c) Who is employed by or associated with any enterprise to conduct or participate, directly or indirectly, in:
> > (1) The affairs of the enterprise through racketeering activity; or
> > (2) Racketeering activity through the affairs of the enterprise.
> . . .
> (h) To conspire to violate any of the provisions of this section.

Nev. Rev. Stat. § 207.400.  Racketeering activity means the defendant "engag[ed] in at least

two crimes related to racketeering that have the same or similar pattern, intents, results,

accomplices, victims or methods of commission, or are otherwise interrelated by

distinguishing characteristics and are not isolated incidents . . . ."  Nev. Rev. Stat.

§ 207.390.  Unlike federal law, a plaintiff in a Nevada civil RICO suit need not prove a

pattern of racketeering activity or continuity.  Siragusa v. Brown, 971 P.2d 801, 809-11

(Nev. 1998).  A plaintiff asserting a Nevada RICO claim must establish: (1) the plaintiff's

injury flows from the defendant's violation of a predicate Nevada RICO act; (2) the

defendant's violation of the predicate act directly and proximately caused the plaintiff's

injury; and (3) the plaintiff did not participate in committing the predicate act.  Allum v.

Valley Bank of Nev., 849 P.2d 297, 299, 301 (Nev. 1993).

A "crime relating to racketeering" includes, among many other listed violations,

taking property from another under circumstances not amounting to robbery.  Nev. Rev.

Stat. § 207.360(9).  Obtaining possession of money or property valued at $250 or more by

means of false pretenses also qualifies as a predicate act.  Id. § 207.360(26).  To

demonstrate a false pretenses predicate act, the plaintiff must establish: "(1) intent to

defraud; (2) a false representation; (3) reliance on the false representation; and (4) that the

victim be defrauded."  Hale v. Burkhardt, 764 P.2d 866, 870 (Nev. 1988).

### 1.  Plaintiffs' Motion for Summary Judgment

The Court will deny Plaintiffs' motion on the Nevada civil RICO claims for the

same reasons as the federal civil RICO claims.  Defendants deny they intended to obtain

Selektpoints through fraudulent means, and contend they were acting with Plaintiffs'

consent, or believed they were doing so.  A genuine issue of material fact therefore remains

regarding whether Defendants took Plaintiffs' property under circumstances not amounting

to robbery or obtained Plaintiffs' property through false pretenses, or conspired to do so.

### 2.  Buchan's Motion for Summary Judgment

Buchan contends Plaintiffs have not presented evidence raising a genuine issue of

material fact that he agreed to engage in predicate acts.[6]  Plaintiffs identify four instances of

predicate acts which, according to Plaintiffs, amount to either taking property of another

under circumstances not amounting to robbery, or false pretenses.  First, Plaintiffs contend

Buchan took Selektpoints trade secrets and used them for his own financial gain and the

promotion of CBData.  Buchan does not dispute he used Selektpoints material to produce

CBData materials and promote CBData.  Rather, he argues he did so at Plaintiffs' direction

and with Plaintiffs' consent.  Plaintiffs have presented evidence that Plaintiffs did not even

know about CBData until the Summer of 2007.  Viewing the facts in the light most

favorable to Plaintiffs, a genuine issue of material fact as to whether Buchan took any of

Plaintiffs' property under circumstances not amounting to robbery or obtained Plaintiffs'

---

[6]  Buchan may prevail by showing that Plaintiffs do not have enough evidence of an essential element to carry their ultimate burden of persuasion at trial.  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

property through false pretenses.  Plaintiffs therefore have presented evidence raising a genuine issue of material fact as to this predicate act.

Next, Plaintiffs contend Buchan took TII's trade secrets when he filed a patent application falsely stating that CBData had rightful ownership of the trade secrets. Plaintiffs do not identify what crime Buchan committed for this conduct, but the reference to a false statement suggests Plaintiffs are contending Buchan obtained the trade secrets through false pretenses.  The only evidence cited for this proposition, however, indicates that it was Bone-Knell, not Buchan, who filed the patent application.  (Pls.' Opp'n to Buchan at 9; Pls.' MSJ at 11.)  Further, Plaintiffs have failed to raise a genuine issue of material fact regarding a necessary element of the false pretenses predicate act, as Plaintiffs have no evidence anyone relied on the patent filing for any purpose.  Moreover, Plaintiffs present no admissible evidence of injury or damages resulting from this predicate act.

Next, Plaintiffs contend Buchan induced TII to contract with SCTN by falsely representing that SCTN's software was fully developed to support Selektpoints, and Buchan received payments from SCTN through Korakianitis.  Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs have presented evidence in the form of Abrahim's declaration that Buchan falsely represented the SCTN software was fully developed when in fact it was not.  Plaintiffs also have presented evidence from which a reasonable jury could find Plaintiffs relied on the representation by entering into the contract with Phoenix for the SCTN technology, and by continuing to make payments on the contract. Additionally, viewing the facts in the light most favorable to Plaintiffs, a reasonably jury could conclude Korakianitis funneled money from SCTN to Buchan upon TII's payment of contract fees to SCTN.  Plaintiffs have presented evidence of damages in the form of contract payments to SCTN for work which Plaintiffs contend they believed already had been completed.  Accordingly, Plaintiffs have presented evidence raising a genuine issue of material fact that this conduct constitutes a predicate act.

Finally, Plaintiffs contend Buchan continued receiving his salary by falsely representing he was devoting his productive time exclusively to TII and maintaining the confidentiality of the information entrusted to him.  Plaintiffs do not identify what crime they believe Buchan committed through this conduct.  The reference to the false statement suggests Plaintiffs are asserting false pretenses.  Plaintiffs rely almost exclusively on inadmissible evidence to support this contention.  (Pls.' Opp'n to Buchan at 9.)  The only admissible evidence to which Plaintiffs cite is Abrahim's declaration, in which he states that TII relied on Buchan's promises of loyalty and confidentiality when awarding Buchan promotions and increased compensation.  (Id.; Pls.' MSJ, Ex. B at 3.)  Plaintiffs do not cite to admissible evidence identifying particular promises of loyalty or confidentiality Buchan made to TII.  Plaintiffs therefore have failed to raise a genuine issue of material fact that Buchan made false representations to TII to support a false pretenses predicate act.  Additionally, this conduct amounts to a "standard breach of contract[] claim dressed as a predicate act."  G.K. Las Vegas Ltd. P'ship v. Simon Property Group, Inc., 460 F. Supp. 2d 1222, 1236 (D. Nev. 2006).  Plaintiffs contend Buchan failed to live up to promises of loyalty and confidentiality as part of his employment agreement, which is nothing more than a standard breach of contract claim, and which therefore does not amount to a predicate act under Nevada's RICO statute.  Id.

Viewing the facts from the admissible evidence in the light most favorable to Plaintiffs, Plaintiffs have presented evidence raising a genuine issue of material fact as to two predicate acts.  The Court therefore will deny Defendant Buchan's summary judgment motion on this claim.

### 3.  Bone-Knell's Motion for Summary Judgment

Bone-Knell likewise contends Plaintiffs have not presented evidence raising a genuine issue of material fact that he agreed to engage in predicate acts.  Plaintiffs identify three predicate acts for Bone-Knell.  First, Plaintiffs contend Bone-Knell took TII's trade

secrets and filed a patent application falsely stating CBData had rightful ownership of the trade secrets. Plaintiffs do not identify what crime Buchan committed for this conduct, but the reference to a false statement suggests Plaintiffs are contending Bone-Knell obtained the trade secrets through false pretenses. As stated above with respect to Buchan, Plaintiffs have failed to raise a genuine issue of material fact regarding a necessary element of the false pretenses predicate act, as Plaintiffs have no evidence anyone relied on the patent filing for any purpose. Moreover, Plaintiffs present no admissible evidence of injury or damages resulting from this predicate act.

Next, Plaintiffs contend Bone-Knell submitted invoices and received payments from TII, and TII paid the invoices because TII incorrectly believed Bone-Knell was working to further TII's interests. Plaintiffs fail to present evidence raising a genuine issue of material fact on this issue. The evidence before the Court shows Bone-Knell submitted only one invoice to TII, which was for filing the patent in the United Kingdom which listed Menalco as the owner. TII presents no evidence of other bills Bone-Knell submitted to TII or that TII paid. Because the only bill Bone-Knell submitted to TII which TII paid was for work performed for TII, Plaintiffs raise no genuine issue of material fact that Bone-Knell committed a predicate act.

Finally, Plaintiffs contend Bone-Knell participated in taking a contract that was TII's property and copying it, with only slight adaptations, for CBData's use.[7] Plaintiffs do not identify what crime Bone-Knell committed by this conduct. Even if this activity constituted a crime, Plaintiffs have not presented evidence raising a genuine issue of material fact that Bone-Knell committed at least two predicate acts. The Court therefore

---

[7] The evidence which Plaintiffs present on this point is also tenuous, as it consists of Buchan's testimony that Bone-Knell "probably" used a Selektpoints contract. Plaintiffs do not present the contracts for a comparison, nor do they present Bone-Knell's testimony regarding what contract he used as a template, or any other evidence suggesting Bone-Knell in fact used a Selektpoints contract.

1  will grant Bone-Knell's motion for summary judgment on this claim.

2          **C.  Plaintiffs' Civil Conspiracy Claim - Count 5 of the Complaint**

3          In count five of the Complaint, Plaintiffs allege Defendants conspired "to obtain

4  Plaintiffs' Trade Secrets," and to disseminate false and fraudulent information in

5  furtherance of their conspiracy to obtain Plaintiffs' trade secrets.  Buchan and Bone-Knell

6  each move for summary judgment, arguing Plaintiffs have no evidence Buchan or Bone-

7  Knell entered into any conspiracy.  Additionally, Buchan and Bone-Knell contend the

8  conspiracy claim duplicates the misappropriation of trade secrets claim, and thus is

9  preempted by Nevada's Uniform Trade Secrets Act.

10          Plaintiffs also move for summary judgment on this claim and respond that the

11  facts show Buchan and Bone-Knell agreed with their co-conspirators to harm TII, and TII

12  relied to its detriment on their false representations, as TII continued to employ them and

13  allow them access to TII's trade secrets.  Plaintiffs also argue the claim is not preempted

14  because it does not depend on the information at issue being a trade secret.  Plaintiffs

15  contend Buchan and Bone-Knell committed other overt acts in furtherance of the

16  conspiracy unrelated to misappropriation of a trade secret.

17          Under Nevada law, to establish a claim for civil conspiracy, the plaintiff must

18  show "a combination of two or more persons who, by some concerted action, intend to

19  accomplish some unlawful objective for the purpose of harming another which results in

20  damage."  Collins v. Union Fed. Sav. & Loan Ass'n, 662 P.2d 610, 622 (Nev. 1983).

21                      1.  Plaintiffs' Motion for Summary Judgment

22          The Court will deny Plaintiffs' summary judgment motion for the same reasons it

23  has denied the state and federal civil RICO claims.  Defendants deny any conspiracy with

24  the intent to cause harm to Plaintiffs.  A genuine issue of material fact therefore remains.

25  ///

26  ///

2.  Buchan's and Bone-Knell's Motions for Summary Judgment

The Nevada Uniform Trade Secrets Act ("NUTSA") displaces "conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."  Nev. Rev. Stat. § 600A.090(1).  However, NUTSA does not displace:

> (a) Contractual remedies, whether or not based upon misappropriation
> of a trade secret;
> (b) Other civil remedies that are not based upon misappropriation of a
> trade secret; or
> (c) Except as otherwise provided in NRS 600A.035, criminal
> sanctions, whether or not based upon misappropriation of a trade
> secret.

Id. § 600A.090(2).  The Act precludes common law tort claims arising from a "single factual episode" of misappropriation of a trade secret.  Frantz v. Johnson, 999 P.2d 351, 357-58 (Nev. 2000); Hutchison v. KFC Corp., 809 F. Supp. 68, 71-72 (D. Nev. 1992) (dismissing various common law tort claims as precluded by the Act).  However, NUTSA does not provide a "blanket preemption to all claims that arise from a factual circumstance possibly involving a trade secret."  Frantz, 999 P.2d at 357 n.3.  If the plaintiff establishes claims that "do not depend on the information at issue being deemed a trade secret," the Act will not preclude those claims.  Id.

The Court will grant Defendants' motions for summary judgment on this claim, as it is barred by the NUTSA.  Although Plaintiffs argue this claim is not duplicative of the misappropriation of trade secrets claim because it involves overt acts in furtherance of the conspiracy that do not involve a trade secret, the object and purpose of the alleged conspiracy is the same as the misappropriation of trade secrets claim.  The basis of the conspiracy is that Defendants allegedly agreed to harm Plaintiffs by stealing the Selektpoints trade secrets to market the program as their own.  That they may have taken acts in furtherance of this conspiracy that do not involve misappropriation of a trade secret does not transform the overall nature of the claim.  Because Plaintiffs had reasonable notice that the sufficiency of their claim was at issue based on Defendants Buchan and Bone-Knell

moving for summary judgment on this claim arguing it was precluded by NUTSA, the Court <u>sua</u> <u>sponte</u> will grant summary judgment in favor of Defendants SCTN and Phoenix on this claim as well.  <u>See</u> <u>Oluwa</u>, 133 F.3d at 1239.

**D.  Plaintiffs' Misappropriation of Trade Secrets Claim - Count 3 of the Complaint**

In count three of the Complaint, Plaintiffs allege they owned unique know-how, concepts, ideas, methodologies, standards, specifications, and business models that constitute protectable proprietary information.  Plaintiffs allege Defendants acquired the trade secrets through improper means and misappropriated them for their own use and benefit.

Buchan moves for summary judgment on this claim, arguing he promoted Selektpoints and explored possible purchase or joint venture agreements at Plaintiffs' insistence, and obtained non-disclosure agreements where appropriate to protect Plaintiffs' confidential information.  Bone-Knell also moves for summary judgment, arguing he did not misappropriate any information, as everything was provided to him by Menalco to file a patent application and to facilitate fund raising to purchase the Selektpoints loyalty program.  Additionally, Bone-Knell argues he had no duty to maintain secrecy except under a confidentiality agreement with another company called EMAX, pursuant to which he owed no duty to Plaintiffs.  Bone-Knell further argues that he did not attend any presentations of the Selektpoints program to potential investors, and in any event all such presentations were given under the protection of non-disclosure agreements.

Plaintiffs respond that the evidence shows the Selektpoints concept was a valuable trade secret to which Buchan had access through his employment.  Plaintiffs contend Buchan misappropriated the trade secret by establishing CBData and disclosing the secrets to CBData to further CBData's and Buchan's own interests.  Buchan disclosed Plaintiffs' trade secrets to potential investors without Plaintiffs' consent and implied that

CBData owned the trade secrets, and he did so in violation of his confidentiality obligation to Plaintiffs in an effort to compete with Plaintiffs.

As to Bone-Knell, Plaintiffs argue Bone-Knell was privy to the Selektpoints concept only due to his relationship with Buchan and for filing patent applications in Menalco's name.  Plaintiffs contend Bone-Knell misappropriated those trade secrets by disclosing the secrets to CBData and by providing support to Koster, Eddy, and Buchan with respect to presentations designed to raise funds, which Plaintiffs contend Bone-Knell knew would result in the disclosure of TII's trade secrets to third parties.  Plaintiffs also move for summary judgment on this claim, arguing Defendants misappropriated Plaintiffs' trade secrets in the form of the Selektpoints business plans by using the plans for Defendants' own benefit, disclosing the plans without Plaintiffs' consent, and concealing such use from Plaintiffs.  Plaintiffs contend these actions were in contravention of Defendants' duties of confidentiality and loyalty, and caused Plaintiffs damages.

Defendant Buchan responds by arguing the business plans were not trade secrets, as they were published by Plaintiffs in a trade magazine.  Buchan also argues that any disclosures he made were pursuant to non-disclosure agreements, and were done with Plaintiffs' knowledge and authorization to pursue a sale or joint venture.  Defendant Bone-Knell responds by arguing the two patent applications covered different inventions, and he had no role in forming CBData.  Defendants SCTN/Phoenix respond by arguing the Selektpoints business plan was not a trade secret, Plaintiffs took no effort to protect the alleged trade secret, Plaintiffs have presented no evidence Plaintiffs derive economic value from its business plans not being known, and no wrongful misappropriation occurred because SCTN/Phoenix were not involved in any conspiracy to misappropriate the alleged trade secrets.

The NUTSA prohibits the misappropriation of trade secrets and provides for a private right of action for damages and injunctive relief. See Nev. Rev. Stat. § 600A.010 et

seq. To establish a misappropriation claim, the plaintiff must show:

> (1) a valuable trade secret; (2) misappropriation of the trade secret through use, disclosure, or nondisclosure of use of the trade secret; and (3) the requirement that the misappropriation be wrongful because it was made in breach of an express or implied contract or by a party with a duty not to disclose.

Frantz, 999 P.2d at 358 (footnotes omitted).  The Act defines a trade secret as:

> information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, prototype, procedure, computer programming instruction or code that:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use; and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Nev. Rev. Stat. § 600A.030(5).  Whether information is a trade secret generally is a question for the fact-finder.  Frantz, 999 P.2d at 358.  Factors to consider include the extent to which others outside the business know the information, the ease or difficulty with which others could acquire the information properly, whether the information was confidential or secret, and the measures the employer took to guard the information's secrecy.  Id. at 358-59.

### 1.  Plaintiffs' Motion for Summary Judgment

As with Plaintiffs' other claims, the Court will deny summary judgment on this claim, as Defendants deny any use was wrongful.  Rather, they contend they were working on Plaintiffs' behalf and/or with Plaintiffs' knowledge and consent, and therefore did not misappropriate anything.  Moreover, Defendants present evidence raising a genuine issue of material fact that Plaintiffs had no trade secrets, as every detail of the Selektpoints program was revealed in detail at public presentations and through the MoneyWorks article.  Buchan testified that all details of the program were publicly released, as did David Parker of Pepper Corporation, an individual Plaintiffs do not allege was a part of the scheme to steal

Selektpoints.  Moreover, Plaintiffs have not identified with any specificity a single trade secret that was not revealed in the MoneyWorks article.

### 2.  Buchan's Motion for Summary Judgment

The Court will deny Defendant Buchan's motion for summary judgment.  As with the Nevada civil RICO claim, Buchan does not deny he used the Selektpoints business plans.  Rather, he contends he did so at Plaintiffs' behest and with Plaintiffs' authorization.  Plaintiffs have presented evidence they did not authorize any disclosures to CBData or CBData's potential investors, as Plaintiffs have presented evidence they were unaware CBData even existed.  The fact that CBData signed non-disclosure agreements prior to any disclosure is of no consequence, as Plaintiffs have presented evidence it did not approve any disclosures to CBData or its potential investors, whether under a non-disclosure agreement or otherwise.  Because Plaintiffs have presented evidence that Buchan misappropriated a trade secret, the Court will deny Defendant Buchan's motion for summary judgment on this claim.

### 3.  Bone-Knell's Motion for Summary Judgment

The Court will grant Bone-Knell's motion for summary judgment on this claim.  Plaintiffs identify two bases for this claim.  First, Plaintiffs' contend Bone-Knell stole TII's trade secrets, established CBData, and disclosed the secrets to CBData.  However, the evidence cited does not support this claim against Bone-Knell.  Rather, the facts cited demonstrate Koster, Eddy, Holmes, and Buchan formed CBData.  Plaintiffs cite to no evidence Bone-Knell formed CBData.  As for the other cited evidence, the only paragraph that refers to Bone-Knell states that Bone-Knell filed a patent application in the United Kingdom on CBData's behalf for the Selektpoints concept in June 2007.  However, Plaintiffs have presented no evidence raising a genuine issue of material fact that Bone-Knell used any of Plaintiffs' trade secrets in preparing the application.  Plaintiffs have not pointed to any evidence as to what materials Bone-Knell relied upon to make the second

application, nor have they identified a single trade secret revealed in the patent filing.  If, as Plaintiffs contend, the second patent application is merely a repeat of the idea contained in the first application, then Bone-Knell could have relied upon the contents of a publicly filed document, not Plaintiffs' trade secrets, in preparing the second application.

Second, Plaintiffs contend Bone-Knell provided support to Koster, Eddy, and Buchan with respect to fund raising presentations, and Bone-Knell knew these presentations sought investors for CBData and would involve disclosure of TII's trade secrets.  Plaintiffs fail to raise a genuine issue of material fact on this contention.  Plaintiffs cite only to Bone-Knell's admission that he provided support to Buchan, Koster, and Eddy.  However, Plaintiffs present no evidence that Bone-Knell's support consisted of providing Koster, Eddy, and Buchan with TII's trade secrets.  Plaintiffs present no evidence Bone-Knell attended any presentations at which TII's trade secrets were revealed.  Indeed, Plaintiffs point to no evidence raising a genuine issue of material fact as to which presentations Bone-Knell provided support and that Plaintiffs' trade secrets were in fact revealed at any of those presentations, or that Bone-Knell knew Plaintiffs' trade secrets would be so revealed.  The Court therefore will grant Bone-Knell's motion for summary judgment on this claim.

### E.  Plaintiffs' Breach of Contract Claim - Count 9 of the Complaint/Breach of Fiduciary Duty - Count 10 of the Complaint

Count nine of the Complaint alleges Buchan breached his employment contracts by acting against Plaintiffs' interests, by devoting part of his productive time to his own endeavors on CBData's behalf, and by disseminating Plaintiffs' confidential business information.  Plaintiffs move for summary judgment on this claim, arguing the evidence establishes Buchan violated his contractual obligations and fiduciary duties by directing the alleged scheme to steal Selektpoints, by not devoting all of his productive time to Plaintiffs, and by disseminating Plaintiffs' confidential information without Plaintiffs' permission.  Buchan contends the employment agreement was illegal and void, and therefore

unenforceable.  Buchan also argues that in any event, he performed under the contract, as all actions he took were at the behest of Plaintiffs.  Finally, Buchan argues the breach of fiduciary duty claim is precluded by the NUTSA, as it is duplicative of Plaintiffs' misappropriation of trade secrets claim.

Under Nevada law, to establish a breach of contract claim, the plaintiff must show: (1) a valid contract; (2) the plaintiff performed or was excused from performing; (3) the defendant materially breached the contract; (4) resulting in damages to the plaintiff.  Cohen-Breen v. Gray Television Group, 1. Inc., --- F. Supp.2d ----, 2009 WL 3241632, *9 (D. Nev. 2009) (applying Nevada law).  A breach of fiduciary duty claim requires the plaintiff to show the existence of a fiduciary duty, the defendant breached that duty, and the breach proximately caused the plaintiff damages.  Stalk v. Mushkin, 199 P.3d 838, 843 (Nev. 2009).

The Court will deny Plaintiffs' motion for summary judgment on this claim. Buchan avers that he worked in Plaintiffs' interest, acted as Plaintiffs' liaison, and worked to fulfill Plaintiffs' wishes and direction that he look for purchasers or joint venture opportunities for Selektpoints.  Because Buchan states under oath that he acted in Plaintiffs' interests and at their behest, a genuine issue of material fact remains regarding whether Buchan violated any contractual or fiduciary duties.[8]

However, the Court rejects Buchan's argument that the breach of fiduciary duty claim is duplicative of the misappropriation of trade secrets claim.  Plaintiffs allege Buchan committed acts breaching his fiduciary duties which do not depend on the misappropriation of any trade secret.  For example, Plaintiffs contend Buchan spent his time developing CBData for his own profit when he was being paid by Plaintiffs to work on bringing Selektpoints to market for Plaintiffs' benefit.  Buchan's alleged personal pursuits on

---

[8]  Buchan did not move for summary judgment on these claims.

43

company time do not depend on Selektpoints being a trade secret.

### F. Plaintiffs' Unfair Competition Claim - Count 13 of the Complaint

Count thirteen of Plaintiffs' Complaint alleges Defendants engaged in unfair competition by attempting to seize for themselves the value of the time and resources which Plaintiffs expended in developing Selektpoints.  Plaintiffs move for summary judgment on this claim, arguing Defendants engaged in a conspiracy to misappropriate Plaintiffs' trade secrets and use them for their own benefit.   Defendants Buchan, Bone-Knell, and SCTN respond by arguing this claim is precluded by the NUTSA as duplicative, and in any event, they never attempted to seize Selektpoints for themselves.  Buchan also argues he gained no market advantage because Selektpoints never was brought to market by anyone.

Nevada common law unfair competition must be "ground[ed] in deception or appropriation of [the plaintiff's] property."  Golden Nugget, Inc. v. Am. Stock Exch., Inc., 828 F.2d 586, 591 (9th Cir. 1987) (applying Nevada law).

The Court will deny Plaintiffs' motion for summary judgment on this claim for the same reasons as the Court denied Plaintiffs' motion as to other claims.  Defendants deny they seized Selektpoints for themselves or otherwise deceived Plaintiffs.  The Court further concludes this claim is preempted by NUTSA.  Plaintiffs' unfair competition claim relies on the theory that Defendants conspired to misappropriate Plaintiffs' trade secrets for their own use.  It arises out of a single factual episode and by Plaintiffs' own argument rests on the misappropriation of Plaintiffs' confidential information.  Because Plaintiffs had reasonable notice that the sufficiency of their claim was at issue based on Defendants challenging the claim as precluded by NUTSA, the Court sua sponte will grant summary judgment in Defendants' favor on this claim.  See Oluwa, 133 F.3d at 1239.

///

///

///

44

### G.  SCTN/Phoenix's Federal and State RICO Claims and Conspiracy Claim - Counts 8-11 of the Counterclaim

Count eight of SCTN/Phoenix's Counterclaim alleges Plaintiffs participated in the conduct of an associated-in-fact enterprise with the Cross-Defendants which failed to return SCTN/Phoenix's patented technology, used the technology when not licensed to do so, and disseminated the technology to unlicensed entities.  As predicate acts, SCTN/Phoenix allege mail and wire fraud to make false representations that Plaintiffs would maintain confidentiality and would abide by the terms of the Licensing Agreement. Count nine alleges Plaintiffs conspired to commit the RICO violation described in count eight.  Count ten alleges a Nevada civil RICO violation based on the same facts, with the predicate acts as making false representations with the intent of obtaining money or property.  Count eleven alleges civil conspiracy based on the same allegations.

Plaintiffs move for summary judgment, arguing SCTN/Phoenix have failed to present evidence Plaintiffs were engaged in an enterprise with the Cross-Defendants because the evidence shows Plaintiffs were unaware of the activities of Buchan, Bone-Knell, Eddy, and Koster.  Plaintiffs also argue SCTN/Phoenix have no evidence Plaintiffs intentionally participated in a scheme to defraud SCTN/Phoenix.  As to the conspiracy claim, Plaintiffs argue SCTN/Phoenix have presented no evidence there was a meeting of the minds with the Cross-Defendants.  Further, Plaintiffs argue that SCTN/Phoenix have failed to identify what trade secrets Plaintiffs allegedly stole through the conspiracy.

SCTN/Phoenix respond by arguing evidence in the record raises an issue of fact that Plaintiffs were aware of and approved the Cross-Defendants' activities. SCTN/Phoenix argue the evidence shows Plaintiffs entered into a non-disclosure agreement with Convergence to explore a sale or joint venture involving Selektpoints.  SCTN/Phoenix argue that after Al-Bahar rejected Convergence's offers, he instructed Convergence to come back with a better offer, one which devalued SCTN/Phoenix, even though Convergence had

a contractual obligation to SCTN/Phoenix at that time under the Mandate to Act. According to SCTN/Phoenix, Plaintiffs were aware of SCTN's financial difficulties, and Plaintiffs thereafter withheld payment and sought to renegotiate the terms of the Licensing Agreement by using their nonpayment as leverage while repeatedly misrepresenting to SCTN/Phoenix that payment was forthcoming.

The Court will grant Plaintiffs' motion for summary judgment on these claims. SCTN/Phoenix have presented no evidence of an enterprise or a meeting of the minds between Plaintiffs and Convergence.  Although SCTN/Phoenix present evidence Al-Bahar instructed Convergence to devalue SCTN in the next offer, SCTN/Phoenix present no evidence Convergence agreed to act in concert with Plaintiffs.  Neither presentation shows dollar figures for what Convergence was presenting as SCTN/Phoenix's value and Al-Bahar rejected Convergence's next offer in which Convergence allegedly was to devalue SCTN/Phoenix.  To the extent Convergence restructured the offer, SCTN/Phoenix have not presented any evidence raising a genuine issue of material fact that Convergence did so as part of an associated-in-fact enterprise or conspiracy with Plaintiffs as opposed to contract negotiation on SCTN/Phoenix's behalf under the Mandate to Act.  SCTN/Phoenix have not presented evidence, for example, that Convergence grossly deflated SCTN/Phoenix's value in the subsequent proposal.  SCTN/Phoenix also present no evidence that Convergence played any role in Plaintiffs' alleged plan to cease paying SCTN/Phoenix's invoices to put pressure on SCTN/Phoenix's already-tight financial situations.  For example, SCTN/Phoenix do not point to any evidence in the record that Convergence knew Plaintiffs were not paying SCTN/Phoenix's bills and sought to take advantage of that circumstance. The Court therefore will grant Plaintiffs' motion for summary judgment on counts 8-11 of SCTN/Phoenix's Counterclaim.

///

///

**H.  SCTN/Phoenix's Misappropriation of Trade Secrets Claim - Count 7 of the Counterclaim**

Count seven of SCTN/Phoenix's Counterclaim alleges SCTN/Phoenix own certain technology, as well as unique know how, ideas, concepts, methodologies, and business models which are proprietary and constitute trade secrets.  SCTN/Phoenix allege Plaintiffs misappropriated those trade secrets, causing damages.

Plaintiffs move for summary judgment on this claim, arguing SCTN/Phoenix have failed to show the existence of a trade secret, or that Plaintiffs misappropriated any such trade secret because Plaintiffs did not have access to the trade secrets, as all software was provided to the client banks or loaded onto point-of-sale terminals.  SCTN/Phoenix respond that they adequately have set forth their trade secrets as software for the cards and point-of-sale terminals, technical manuals, training videos, and technical overview documentation.  SCTN/Phoenix contend the evidence shows this information was provided to Plaintiffs, and Plaintiffs have not returned all of the property.

The Court will deny Plaintiffs' summary judgment motion on this claim.  Viewing the facts and reasonable inferences therefrom in the light most favorable to Plaintiffs, SCTN/Phoenix have identified the trade secrets at issue as software on the point-of-sale terminal and on the smart card; specifications for the interface to the point-of-sale terminal, smart card, and back office system; user manuals; and training videos.  (SCTN Opp'n, Ex. 1 at 234, Ex. 9 at 424-29; Countercl. at 50.)  Reference to tangible trade secret material will suffice to adequately describe the trade secret.  See Imax Corp. v. Cinema Tech., Inc., 152 F.3d 1161, 1167 (9th Cir. 1998) (stating that identification of a trade secret is sufficient when it refers to trade secret material such as engineering drawings and blueprints, but reference to a general catchall phrase to describe features of a system not disclosed in a patent does not adequately describe the trade secret where the trade secret is the intangible concept, in this case, the dimensions and tolerances in the design of a

complex projector system).  Additionally, SCTN/Phoenix have presented evidence they

provided those materials directly to Plaintiffs, including a point-of-sale terminal and smart

card left in Buchan's office, as well as specifications, user manuals, and training videos sent

to Plaintiffs.  The Court therefore will deny Plaintiffs' motion on this claim.

### I.  SCTN/Phoenix's Conversion and Unfair Trade Practices Claims - Counts 4 and 12 of the Counterclaim

Count four of the Counterclaim alleges Plaintiffs have possession of

SCTN/Phoenix's patented technology but will not return it despite requests for its return.

Count twelve of the Counterclaim alleges Plaintiffs' refusal to return the patented

technology is an attempt to convert the technology to Plaintiffs' own use or to copy and/or

exhibit it for others, in violation of Nevada Revised Statute § 603.040.

Plaintiffs move for summary judgment on these claims, arguing SCTN/Phoenix

have failed to provide evidence that Plaintiffs have retained or copied any proprietary

information.  Plaintiffs also argue Nevada law does not protect conversion of intangible

assets.  SCTN/Phoenix respond by arguing that both Buchan and Radivojsa testified that

SCTN/Phoenix's proprietary information was contained on a smart card and point-of-sale

terminal which were located in Buchan's office at the time he left Plaintiffs' employ, and

neither item has been returned.  SCTN/Phoenix also argue Nevada law will protect

intangible assets from conversion where they are merged with something tangible, like the

terminal and smart card in this case.

Under Nevada law, conversion is "a distinct act of dominion wrongfully exerted

over another's personal property in denial of, or inconsistent with his title or rights therein

or in derogation, exclusion, or defiance of such title or rights."  M.C. Multi-Family Dev.,

L.L.C. v. Crestdale Assocs., Ltd., 193 P.3d 536, 542 (Nev. 2008) (quotation omitted).

Conversion is "an act of general intent, which does not require wrongful intent and is not

excused by care, good faith, or lack of knowledge."  Id. at 542-43 (quotation omitted).

Whether the defendant converted the plaintiff's property generally is a question for the fact finder.  Id. at 543.  Under Nevada law, intangible property may be converted under certain circumstances, including where there is conversion of tangible property in which intangible rights are merged.  Id. at 543 (citing the Restatement (Second) of Torts § 242).  Pursuant to Nevada Revised Statutes § 603.040(1)(b), it is an unfair trade practice for a person to convert a proprietary program or the data stored in a computer with the intent to convert that program or data to his own use of for the use of another.

The Court will deny Plaintiffs' motion for summary judgment on the conversion claim.  Viewing the facts and reasonable inferences therefrom in the light most favorable to the nonmoving parties, SCTN/Phoenix have presented evidence raising a genuine issue of material fact that Plaintiffs have retained possession of SCTN/Phoenix's property.  Buchan testified he left a point-of-sale terminal in his office when he left TII, and Radivojsa testified the item has not been returned to SCTN/Phoenix.  To the extent the software is considered intangible, it is merged in tangible items in the form of the point-of-sale terminal and smart card.  The Court also will deny Plaintiffs' motion for summary judgment on the unfair trade practices claim, as Plaintiffs' arguments related to this claim are the same as for conversion.

### J.  SCTN/Phoenix's Intentional Interference With Prospective Economic Advantage Claim - Count 13 of the Counterclaim

Count thirteen of the Counterclaim alleges Plaintiffs and Cross-Defendants intentionally interfered with SCTN/Phoenix's prospective economic advantage in seeking potential licensees.  Plaintiffs move for summary judgment on this claim, arguing SCTN/Phoenix have provided no evidence of prospective relationships with licensees that were harmed, Plaintiffs' knowledge of such relationships, or Plaintiffs' intent to harm SCTN/Phoenix.  SCTN/Phoenix respond that Radivojsa testified that Phoenix lost an agreement with a potential licensee, GTMT, as a result of Plaintiffs' conduct, of which

Plaintiffs were aware as demonstrated by Plaintiffs' contact with GTMT.  SCTN/Phoenix argue it was Plaintiffs' intent to harm SCTN/Phoenix, because Plaintiffs would have no reason to interfere absent this motive.

The Court will grant Plaintiffs' motion for summary judgment on this claim. Although SCTN/Phoenix identify GTMT as the potential licensee, SCTN/Phoenix have provided no evidence raising a genuine issue of material fact that it was Plaintiffs who communicated with GTMT.  Radivojsa could not confirm that it was Plaintiffs who contacted GTMT, instead testifying that SCTN/Phoenix "received from the South African police that one of the people that we had licensed to had been contacted by someone from Dubai stating that SCTN was . . . a fraud . . . .  Given that it's coming from Dubai, we have suspicions that TII and Menalco are involved."  (SCTN Opp'n, Ex. 9 at 443-44.)  Radivojsa stated they were pursuing the matter because they wanted to "be clear who is the one who's doing this."  (Id. at 44.)  When Plaintiffs' counsel requested discovery on the matter, SCTN/Phoenix's counsel responded that they would seasonably supplement discovery but they did not "have any resolution at this point as to what – what's really going on.  Until we do, we're not going to produce things that leave us with half the story."  (Id. at 445.) SCTN/Phoenix have presented no evidence raising an issue of material fact that Plaintiffs were the source of the alleged communications to GTMT.  SCTN/Phoenix therefore have failed to present evidence raising a genuine issue of material fact that Plaintiffs interfered with any prospective economic advantage.

### K.  SCTN/Phoenix's Claims Related to the Licensing Agreement - Counts 1-3, 5-6 of the Counterclaim

Count one of the Counterclaim asserts a claim for breach of contract against Plaintiffs based on Plaintiffs' failure to pay all invoices, as well as cancellation of the contract resulting in SCTN/Phoenix losing out on future fees-per-transaction once Selektpoints went active.  Count two alleges breach of the duty of good faith and fair

dealing based on the same conduct. Count three alleges Defendants were unjustly enriched by using SCTN/Phoenix technology without permission or license. Count five alleges fraud based on Plaintiffs' false and misleading statements to SCTN/Phoenix that Plaintiffs would pay the unpaid invoices, thereby inducing SCTN/Phoenix to continue providing the technology and professional services after Plaintiffs already had decided they were not going to pay the invoices. Count six alleges negligent misrepresentation based on similar alleged misrepresentations.

Plaintiffs move for summary judgment on these claims, arguing SCTN/Phoenix breached the contract and the duty of good faith and fair dealing by scheming to defraud Plaintiffs of the benefit of the Licensing Agreement. Plaintiffs thus argue they were permitted to suspend their own performance on the contract upon learning of SCTN/Phoenix's participation in the scheme. Plaintiffs also argue the Licensing Agreement's purpose was frustrated by SCTN/Phoenix's participation in the scheme, thus excusing performance. Plaintiffs also argue SCTN/Phoenix's unjust enrichment claim cannot lie because a written contract governs the parties' relationship. Finally, Plaintiffs argue SCTN/Phoenix's claims for fraud and negligent misrepresentation fail because they attempt to convert breach of contract claims into torts. Plaintiffs contend the economic loss doctrine prevents recovery in these circumstances. Further, Plaintiffs argue SCTN/Phoenix cannot show they relied upon any representations regarding payment to their detriment because SCTN/Phoenix were not providing services to Plaintiffs in good faith, and thus could not justifiably rely on any representations that Plaintiffs would continue to pay them.

SCTN/Phoenix respond that Plaintiffs' motion with respect to these claims relies primarily on Plaintiffs' theory that SCTN/Phoenix were involved in a conspiracy against Plaintiffs. SCTN/Phoenix argue that because a genuine issue of fact remains on that issue, Plaintiffs' motion must be denied as to these claims as well. SCTN/Phoenix also object to Plaintiffs' reliance on the defense of frustration of purpose, as Plaintiffs did not set forth

this affirmative defense in their response to the Counterclaim.  As to the fraud and negligent misrepresentation claims, SCTN/Phoenix argue that the economic loss doctrine applies only to unintentional torts, not fraud.  Further, SCTN/Phoenix argue the Nevada Supreme Court expressly has held the economic loss doctrine does not apply to a negligent misrepresentation claim.  Finally, as to unjust enrichment, SCTN/Phoenix note they pled this claim in the alternative, and recognize they cannot recover for both breach of contract and unjust enrichment.

a.  Breach of Contract and Duty of Good Faith and Fair<br>Dealing/Unjust Enrichment

The Court will deny Plaintiffs' motion for summary judgment on the breach of contract and breach of the duty of good faith and fair dealing claims, as Plaintiffs' argument as to these two claims presumes SCTN/Phoenix was involved in a conspiracy against Plaintiffs.  As noted elsewhere in this Order, a genuine issue of material fact remains regarding SCTN/Phoenix's alleged participation in any such conspiracy.  The Court also will not consider the frustration of purpose defense because Plaintiffs did not assert this as an affirmative defense in their Answer to the Counterclaims.  Even if the Court considered this defense, it likewise relies upon the same conspiracy theory for which issues of fact remain.  As to unjust enrichment, SCTN/Phoenix may pursue this claim in the alternative to their breach of contract claim, however, they may not recover on both theories.

b.  Fraud and Negligent Misrepresentation

Plaintiffs argue SCTN/Phoenix's claims for fraud and negligent misrepresentation fail because they attempt to convert breach of contract claims into torts.  Plaintiffs contend the economic loss doctrine prevents recovery in these circumstances.  Further, Plaintiffs argue SCTN/Phoenix cannot show they relied upon any representations regarding payment to their detriment because SCTN/Phoenix were not providing services to Plaintiffs in good faith, and thus could not justifiably rely on any representations that

Plaintiffs would continue to pay them.

The economic loss doctrine bars unintentional tort actions in which the plaintiff seeks to recover purely economic losses. <u>Terracon Consultants W., Inc. v. Mandalay Resort Group</u>, 206 P.3d 81, 86 (Nev. 2009) (en banc). However, exceptions to the doctrine exist. <u>Id.</u> at 88. Among those exceptions are claims for negligent misrepresentation. <u>Id.</u> To turn a contract case into a fraud case, the plaintiff must establish intentional wrongful conduct, such as evidence "the promisor had no intention to perform at the time the promise was made." <u>Bulbman, Inc. v. Nevada Bell</u>, 825 P.2d 588, 592 (Nev. 1992).

Because the economic loss doctrine applies only to unintentional torts, the doctrine does not bar SCTN/Phoenix's fraud claim. Additionally, Nevada has recognized an exception to the economic loss doctrine for negligent misrepresentation claims, and thus SCTN/Phoenix's negligent misrepresentation claim also is not barred. Further, SCTN/Phoenix have presented evidence supporting intentional wrongful conduct for their fraud claim. SCTN/Phoenix have presented evidence from which a reasonable jury could find that Plaintiffs' employees were assuring SCTN/Phoenix of imminent payment of outstanding invoices at a time when Plaintiffs had no intention of making those payments.

Additionally, a genuine issue of material fact remains as to whether SCTN/Phoenix reasonably relied on Plaintiffs' representations that the outstanding invoices would be paid. Plaintiffs' contention that any such reliance was unreasonable relies on their theory that SCTN/Phoenix were in a conspiracy to steal Selektpoints. As discussed previously, genuine issues of material fact remain regarding SCTN/Phoenix's alleged participation in any conspiracy or scheme to defraud. The Court therefore will deny Plaintiffs' motion on the fraud and negligent misrepresentation claims.

**IV.  CONCLUSION**

IT IS THEREFORE ORDERED that Defendant/Cross-Defendant Robert Buchan's Motion for Summary Judgment (Doc. #272) is hereby GRANTED in part and

1  DENIED in part.  The motion is granted with respect to counts 1, 2, and 5 of Plaintiffs'

2  Complaint.  The motion is denied in all other respects.

3          IT IS FURTHER ORDERED that Defendant/Cross-Defendant Mark Bone-

4  Knell's Motion for Summary Judgment (Doc. #273) is hereby GRANTED.

5          IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment

6  (Doc. #275) is hereby GRANTED in part and DENIED in part.  The motion is granted as to

7  Defendants SCTN/Phoenix's Counterclaims in counts 8-11 and 13.  The motion is denied in

8  all other respects.

9          IT IS FURTHER ORDERED that the Court <u>sua</u> <u>sponte</u> grants summary judgment

10  in favor of Defendants Buchan and Bone-Knell on count 13 of Plaintiffs' Complaint.

11          IT IS FURTHER ORDERED that the Court <u>sua</u> <u>sponte</u> grants summary judgment

12  in favor of Defendants SCTN and Phoenix on counts 1-2, 5, and 13 of Plaintiffs'

13  Complaint.

14          IT IS FURTHER ORDERED that the parties shall file a proposed joint pre-trial

15  order for all remaining claims no later than March 5, 2010.

16

17  DATED: February 1, 2010

18

19  _____

20          PHILIP M. PRO
        United States District Judge

21

22

23

24

25

26